All prior orders involved in this appeal are affirmed in all respects.

Costs are assessed against counsel for claimants.

UNITED STATES of America, Plaintiff–Appellee,

v.

Robert KAMOGA, Defendant–Appellant.

No. 98–3346.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1999.

Decided April 28, 1999.

As Amended on Denial of Rehearing and Rehearing En Banc May 28, 1999.

Frances C. Hulin, Estaban F. Sanchez (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

David B. Mote (argued), Office of the Federal Public Defender, Springfield, IL, for Defendant–Appellant.

Before CUDAHY, RIPPLE and DIANE P. WOOD, Circuit Judges.

CUDAHY, Circuit Judge.

This case confirms the old saw that fidelity among law-breakers is as deep as a desert mirage and lasts about as long. By the time Robert Kamoga was arrested for his part in a bank fraud scheme, all of the other players had flipped and fingered him as their ring leader. Kamoga's repeated

denials of a leadership role come too late. The story goes something like this:

Kamoga and some associates approached Earvin Newton and Jedi Jones at a Houston nightclub called Jamaica Jamaica and asked if they wanted to make some fast money. Kamoga and Newton knew each other from a previous job. About a week later, Kamoga visited Newton and Jones and told them the plan. Newton and Jones would recruit "someone else," who would deposit worthless checks in an out-of-state bank account and withdraw cash to be distributed among the participants. Kamoga, for his part, would provide the bad checks and pass them along to Newton and Jones. Kamoga promised Newton between 20 and 25 percent of the total take. Newton and Jones joined up, and recruited the "someone else," Marvin Bledsoe. Bledsoe brought in Ed Vinson, a friend in East St. Louis, Illinois, who in turn drafted Charles Strickland, a resident of Springfield, Illinois. Vinson and Strickland together owned a company called S & S Enterprises.

With the pieces in place, Kamoga set the scheme in motion. He gave Newton an envelope containing two checks drawn on the account of Air Liquide America Corporation and instructed him to pass it along without opening it. Newton did as he was told, and passed the envelope with the checks to Bledsoe. Bledsoe made the checks payable to S & S and sent them along to Vinson, who forwarded them to Strickland. Strickland opened a new account for S & S at the First of America Bank in Springfield and deposited the checks, which had a face value of more than $170,000. Over the next week, Strickland withdrew about $68,000 of the deposited funds and delivered $21,000 to Vinson. Strickland was arrested shortly thereafter and agreed to cooperate with the authorities. In short order, Vinson, Bledsoe, Newton and Jones were all lured to Springfield by the promise of a payoff and arrested. Each agreed to cooperate.

Newton and Jones both gave detailed statements to the F.B.I. implicating Kamoga as the mastermind. Newton stated that Kamoga had approached him, visited him at his home, made veiled threats about maintaining secrecy, shown him card stock to be used for printing fake checks and promised easy money in return for recruiting the "someone else" to deposit the checks. Jones, who was not present at all of the meetings between Newton and Kamoga, corroborated Newton's claim that Kamoga was the organizer. While under arrest, Newton agreed to contact Kamoga and set up another check drop. Newton first called a friend of Kamoga's and asked the friend to have Kamoga return the call. The F.B.I. taped the return call. Newton informed Kamoga that the two checks had been cashed and asked him to procure two more. The conversation continued:

Kamoga: Two more of those?

Newton: Yeah.

Kamoga: Ya need more?

Newton: That's, they want, they want two more.

Kamoga: I need to print?

Newton: Huh?

Kamoga: To print?

Newton: Yeah.

Kamoga: Okay. I need to go look for them.

The F.B.I. arrested Kamoga when he arrived at the Colorado Bar & Grill, the designated meeting spot in Houston. At that time, Kamoga was carrying only legitimate personal checks.

At his detention hearing in Texas, Kamoga testified and denied any involvement in the scheme. He admitted to knowing Newton from a previous job, but claimed that he had agreed to meet at the Colorado Bar & Grill because he thought Newton was bringing him money, as friends do. He later pleaded guilty in the district court to the single charge of bank fraud. As is customary, the probation office completed a presentence investigation and filed a pre-

sentence report (PSR). Kamoga raised two legal objections to the PSR. First, he objected to the PSR's recommendation that he receive a four-point offense level enhancement under U.S.S.G. § 3B1.1(a) for being an organizer and leader of the fraud. Second, he objected to the PSR's recommendation that the court deny him a downward adjustment under § 3E1.1 for acceptance of responsibility. His other objections to the PSR challenged accounts of the facts underlying these sentencing guideline recommendations. For example, Kamoga maintained in his comments on the PSR that "he never provided any checks on the account of Air Liquide America Corporation—rather ... he provided only information printed on commission checks he received" from his job. He asserted, in short, that he "was a minor participant in the scheme, rather than its organizer."

At his sentencing hearing, Kamoga presented two witnesses. He first called the probation officer who prepared the PSR, Kevin Kelly. Kelly testified that Jones had once been arrested for possession of stolen checks and another time for passing bad checks, but had never been convicted of any crimes. Kelly further testified that he had been unable to unearth any evidence connecting Kamoga to Air Liquide America. Kamoga himself was the second witness. On direct examination, he testified that he only provided Newton with checks from which Newton could copy numbers. On cross examination, Kamoga admitted that he had lied about his knowledge of the fraud at his detention hearing and that he had not told the whole truth about his relationship with Newton. He nonetheless held firm in his denial of a leadership role.

Following this testimony, Kamoga argued to the court that the government had failed to show by a preponderance of the

evidence that he had played an aggravating leadership role in the fraud. He cited the fact that he had never received any of the ill-gotten money and Jones' bad-check-related brushes with the law as evidence that Newton and Jones, not he, masterminded the fraud. Kamoga also disputed the government's transcription of part of his taped telephone conversation with Newton, claiming that he said "Are they to print?" rather than "I need to print?" His understanding of the phone conversation, Kamoga concluded, bolstered his theory that Newton was the organizer.

The district judge was not persuaded. He found Kamoga's account of events "not credible" and noted that it was likely that Kamoga had perjured himself at his detention hearing. Whether Kamoga printed the fake checks himself or only provided the account numbers was immaterial, the judge held, because Kamoga was still the ultimate source. He also admonished Kamoga for exacerbating his predicament by continuing to dispute his role in the scheme. The district judge therefore denied Kamoga's objections to the PSR, applied a four-point leadership enhancement under § 3B1.1(a), denied a three-point downward adjustment under § 3E1.1 and sentenced Kamoga to 45 months in prison.[1] Kamoga now appeals his sentence.

Kamoga first complains about the district court's application of § 3B1.1(a). Section 3B1.1(a) provides for a four-point enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Subsections (b) and (c) allow smaller increases for less aggravating roles or less extensive criminal schemes.

Kamoga makes one argument for the first time before this court, which we review for plain error. See *United States v. Blythe*, 944 F.2d 356, 359 (7th Cir.1991).

---

1. Kamoga had a criminal history category of I. Applying the § 3B1.1(a) adjustment and denying the § 3E1.1 adjustment resulted in an Offense Level of 21 and yielded a sentenc-ing range of 37–46 months. Had Kamoga done everything necessary to mitigate his guilt, the district judge stated, the Guidelines would have yielded a range of 21–27 months.

In his brief, Kamoga claims that, in order to apply § 3B1.1(a), a sentencing court must find that a defendant *controlled* at least four other participants. At oral argument, Kamoga apparently changed his tune, claiming that § 3B1.1(a) includes a *knowledge* requirement: to apply the enhancement, a court has to find that a defendant *knew* or *could have reasonably foreseen* that there were four other participants.[2] Because the evidence showed only that he had control over and knowledge of at most three others—Newton, Jones and "someone else"—Kamoga concludes that the district court's application of § 3B1.1(a) was plainly erroneous.[3]

These arguments are but variations on the same discordant legal theme. "Section 3B1.1 does not require that [a defendant] knew of or exercised control over all of the participants." *United States v. Dota*, 33 F.3d 1179, 1189 (9th Cir.1994). Instead, the ultimate question is one of relative responsibility for the crime, *see, e.g., United States v. Skinner*, 986 F.2d 1091, 1097 (7th Cir.1993), and a sentencing court may consider many factors in making that determination. See U.S.S.G. § 3B1.1, comment. (n.4) (listing factors). Control is probative, but it is not the decisive factor, *see, e.g., United States v. Emerson*, 128 F.3d 557, 562 (7th Cir. 1997); *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir.1994),[4] and, to the extent it is relevant, a defendant's control over other participants can be indirect, as well as direct. *See, e.g., United States v. Hall*, 109 F.3d 1227, 1234 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 153, 139 L.Ed.2d 99 (1997). When we discuss control, then, we use the word "in a broad sense to mean some kind of supervisory or organizational role with respect to those participants, including recruitment of other participants." *Id.* at 1234–35; *see also* U.S.S.G. § 3B1.1, comment. (n.2). "That does not mean that others must have played marionette to the defendant's puppeteer," *Mustread*, 42 F.3d at 1104, and "[t]he fact that fewer than five [of the other participants] actually reported to [the defendant] is immaterial." *United States v. Evans*, 92 F.3d 540, 545 (7th Cir.1996). So long as a defendant organized or supervised a criminal activity involving four other participants, a District Court can apply § 3B1.1(a). Kamoga's haploscopic focus on control is simply wrong.

Kamoga's attempt to recast this argument—by asserting that § 3B1.1 requires knowledge—suffers a similar flaw. The plain language of § 3B1.1 does not mention knowledge; the comments to this section are mute on the point; and we see no reason to fashion such a requirement from whole cloth. *See Dota*, 33 F.3d at 1189. Section 3B1.1(a) does not require that a defendant know of all of the other participants in the criminal activity. This conclusion also follows from our discussion of control. Again, § 3B1.1 provides a range of adjustments in order to hold accountable for their role defendants who are relatively more responsible for the crime. *See* U.S.S.G. § 3B1.1, comment. (background). It is designed precisely to prevent masterminds of criminal schemes from escaping responsibility for their role simply by delegating some authority to only one or two

**2.** Generally, arguments raised for the first time at oral argument are waived for the purposes of appeal. *See, e.g., Ricci v. Arlington Heights, Ill.*, 116 F.3d 288, 291–92 (7th Cir.1997). "It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Sere v. Board of Trustees of the Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir.1988) (internal quotations and citations omitted). Nonetheless, we choose to consider Kamoga's recast argument because

we do not believe that it is significantly distinct from the original.

**3.** We understand Kamoga to be arguing that a defendant must be aware of the *specific existence* of at least four of the other participants, rather than, for example, their *identities* or *roles* in the scheme.

**4.** *United States v. Guyton*, 36 F.3d 655 (7th Cir.1994), on which Kamoga relies, is not to the contrary.

deputies. It is enough that the others be acting according to the organizer's design and in furtherance of his or her plan. For these reasons, we reject Kamoga's contention that § 3B1.1 requires control over and/or knowledge of all of the other participants in a criminal activity.[5]

■ Kamoga also challenges the factual basis for the district court's conclusion that he was a leader. We review this decision for clear error. *See United States v. Porretta,* 116 F.3d 296, 299 (7th Cir. 1997). Kamoga claims that the district court erred in relying on the portions of the PSR to which he had objected. As the government points out, however, Kamoga must do more than simply deny the facts in a PSR. *See United States v. Coonce,* 961 F.2d 1268, 1279–80 (7th Cir.1992). Moreover—and most problematic for Kamoga—the district court's factual findings were based largely on credibility determinations, namely that Kamoga's explanation of the events was less believable than that of the other defendants who had all fingered Kamoga as their leader. We rarely disturb such credibility determinations, *see, e.g., United States v. Dillard,* 43 F.3d 299, 308 (7th Cir.1994), and decline the invitation to do so here. The facts are more than sufficient to justify the district court's conclusion that Kamoga played an aggravating role in this scheme. That decision was not clearly erroneous.

■ Kamoga next challenges the denial of his request for an offense-level reduction under § 3E1.1, which permits such an adjustment "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." A defendant carries the burden of showing entitlement to this reduction, *see, e.g., United States v. Ewing,* 129 F.3d 430, 435 (7th Cir.1997), and we review a district court's decision to deny it

for clear error. *See United States v. Wetwattana,* 94 F.3d 280, 285 (7th Cir.1996).

Kamoga argues that he is entitled to this adjustment because he pleaded guilty and spared the government the expense of trial. This argument is untenable. Pleading guilty does not alone create an entitlement to a reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1, comment. (n.3). The defendant must truthfully admit "the conduct comprising the offense(s) of conviction, and truthfully admit or not falsely deny any additional relevant conduct for which the defendant is accountable." *Id.,* comment. (n.1). If the defendant "falsely denies ... relevant conduct that the court determines to be true, he has acted in a manner inconsistent with the acceptance of responsibility." *United States v. Martinez,* 169 F.3d 1049, 1056 (7th Cir.1999) (internal quotations and citations omitted). Kamoga never admitted the conduct underlying his guilty plea and, indeed, he likely perjured himself at his Texas detention hearing when he testified to his lack of knowledge. Absent a truthful and complete admission of the underlying facts, Kamoga's guilty plea is insufficient to support a finding of acceptance of responsibility. *See id.* We therefore find no error in the district court's refusal to apply this guideline, and the sentence is AFFIRMED.

---

5. Both parties assert that Kamoga's failure to raise this issue below requires that we uphold the district court's decision absent plain error. We employ this standard, but note that Kamoga's argument could easily have been framed as a purely legal challenge, which we would have reviewed *de novo.* Even if we had applied this less deferential standard, however, Kamoga's claim that § 3B1.1 requires control or knowledge would have failed. Again, this argument is simply wrong.